## SAN AUGUSTINE INDEPENDENT SCHOOL DIST. v. FREELOVE.

### No. 4337.

Court of Civil Appeals of Texas. Beaumont.

May 10, 1946.

Rehearing Denied June 5, 1946.

Ramsey & Ramsey, of San Augustine, for appellant.

Shirley W. Peters, of Dallas, for appellee.

WALKER, Justice.

This appeal is from a judgment in behalf of Charles T. Freelove against the San Augustine Independent School District. The proceeding originated with the petition of the First National Bank of San Augustine, wherein the Bank prayed judgment against Freelove on a promissory note executed by Freelove and payable to the Bank. Freelove then made the School District a third party defendant alleging a contract between him and said District wherein he agreed to serve as architect for the District in erecting a school building. He alleged further that "said contract and benefits occurring thereunder" had been transferred to the Bank as collateral security for payment of the note sued upon by the Bank; that by virtue of certain matters which need not be stated in detail the District had eventually agreed to pay him a flat fee of $5,000 in lieu of the compensation provided in his agreement with the District, of which he had received $3,000; and that he had performed the agreed services and was entitled to the balance of the promised fee, to-wit, $2,000. In the alternative, he alleged that his services were reasonably worth $10,000, and that the District was liable for the balance of that sum unpaid, to-wit, $7,000.

The material parts of the District's answer to this pleading consisted of a general denial, and a cross action against Freelove to recover an overpayment, namely, a part of the $3,000 paid to Freelove representing work Freelove agreed to do but actually did not perform. The essence of this cross action is a calculation and statement of what Freelove's services were reasonably worth, and a prayer for recovery of the excess of the $3,000 above that sum. In substance, the District alleged that Freelove breached his contract in two respects, namely, in failing to provide certain plans referred to as "rock plans" (that is, in failing to provide any of such plans, or else, in failing to provide plans which were usable), and in failing to supervise the erection of the building down to the time of its completion; that as a consequence of his breach, he was only entitled to payment for services actually rendered by him; that the "rock plans" not fur-

nished represented 30% of the complete plans and specifications and the same proportion of the value of such complete plans, which was 3½% of the total cost of construction; and that Freelove only supervised 30% of the construction, for which he was entitled to 30% of the value of a complete job of supervision, namely, 1½% of the total cost of construction. The District alleged further that the total cost of construction was $52,105.60; that because Freelove did not provide "rock plans" as agreed, the compensation due him should be proportionately diminished (30% of 3½% of $52,105.60, or $547.11 out of $1,823.70, leaving a balance due him of $1,276.59) and that because he only supervised 30% of the construction he should receive that proportion of the value of a complete job of supervision (30% of 1½% of $52,105.60, namely, $234.47); that "by reason of Defendant's (the reference is to Freelove) failure to comply with the provisions of the contract, 3rd party defendant (reference is to the District) has sustained damage in the sum of $1,488.94, which is the difference between all sums paid to Defendant, to-wit, $3,000, and the reasonable value of the services rendered by Defendant, which is $1,511.06." This $1,511.06 represents the sum of the $1,276.-59 and the $234.47 referred to above.

The cause was tried to a jury. The court submitted two special issues, which with the jury's answers were as follows:

"Special Issue No. 1. Do you find from a preponderance of the evidence that San Augustine Independent School District agreed to pay Charles T. Freelove a fixed fee of $4,999.61? Answer: No. (This Issue, of course, submitted Freelove's contention that the District promised to pay him a flat fee).

"Special Issue No. 2. What amount of money, if any, would be a reasonable fee for the services of Charles T. Freelove and accepted by San Augustine Independent School District? Answer: $750.00 additional pay."

On this verdict, the trial court rendered judgment in behalf of Freelove against the District for $750. Judgment was also entered in behalf of the First National Bank

of San Augustine against Freelove for the amount due on Freelove's note to the Bank; no error has been assigned to this part of the judgment.

The District makes no complaint regarding the charge nor the verdict thereunder except as regards the trial court's refusal to submit certain Issues requested by the District. Under Point 1, the District assigns as error the trial court's refusal to submit its requested Issue 5; and under Points 2, 3 and 4, assigns error to the refusal to submit its requested Issues 2, 3 and 4. All of these Points will be discussed together.

Requested Issue 5 read: "Do you find from a preponderance of the evidence that the defendant did not supervise the construction of said building as called for in said contract?" In connection therewith, although no complaint is here made of the refusal to submit them, the District requested certain issues numbered 6 and 7, reading; (No. 6) "If you have answered the foregoing issue 'no', then what per cent of the construction of said building did the defendant fail to supervise?" and (No. 7): "If you have found that the defendant failed to supervise any per cent of the construction of said building, then what do you find from a preponderance of the evidence to be the amount of damages, if any, sustained by third party defendant by reason of defendant's failure to supervise any part of said construction, if he did fail to supervise any part?" A special instruction was requested with Issue 7.

Requested Issues 2, 3 and 4 read: (No. 2) "Do you find from a preponderance of the evidence, that under the contract with the School Board, the defendant was required to furnish rock plans?" (No. 3) "If you have answered the foregoing isssue 'Yes,' then do you find from a preponderance of the evidence that the defendant did not furnish the rock plans?" And (No. 4) "What do you find from a preponderance of the evidence to be the reasonable cost of the preparation of said rock plans?"

It is apparent that the requested Issues were intended to submit the subject matter of the District's cross action

against Freelove. Disregarding matters affecting the form of these Issues, we hold that said Issues were properly refused and we overrule the District's Points 1, 2, 3 and 4 on the following grounds:

(1) The requested Issues do not submit the controlling fact question raised by the District's cross action against Freelove. The substance of that matter, namely, the reasonable value of Freelove's services to the District, was submitted to the Jury in Issue 2 of the trial court's charge; and no objection to the form of said Issue 2 is before us.

The District bases the cross action upon the theory that Freelove breached his contract with the District and is therefore entitled only to compensation for what he actually did. The rules governing the mutual rights of Freelove and the District in such a case were stated in Carroll v. Welch, 26 Tex. 147, at page 149, as follows:

"The doctrine of the earlier decisions to the effect that, where the contract in cases like the present is entire, the performance by the employee is a condition precedent, and he has no remedy until he has fully performed his part, is not now the recognized doctrine of the court. Hillyard v. Crabtree's Adm'r, 11 Tex. 264, 62 Am.Dec. 475, Sedg. on Meas. of Dam. 215, 2d edit. According to the modern decisions and the decisions of this court, the rule appears to be that if the employee abandons his contract the employer shall be charged with only the reasonable worth, or the amount of benefit he has received upon the whole transaction, and in estimating the amount, the contract price cannot be exceeded. The former is allowed to recover for his part performance, its reasonable worth, not to exceed the contract price, and the latter to recoup or reconvene his damages for the breach of contract by the former."

Freelove's right to compensation is based on quantum meruit, that is, on a promise implied in law to pay him the reasonable value of services rendered by him. In Colbert v. Dallas Joint Stock Land Bank, 129 Tex. 235, 102 S.W.2d 1031, 1034, the court said:

"Texas is one of the states that have adopted the doctrine of Britton v. Turner, 6 N.H. 481, 26 Am.Dec. 713, that one who has but partially performed an entire contract may recover on quantum meruit the reasonable value of the services rendered and knowingly accepted, in an amount not exceeding the contract price, with the right accorded the defendant to recoup or recovene his damages for the breach of the contract by the plaintiff."

The question being, in a sense, what sum did the District impliedly agree to pay Freelove, and that sum being the reasonable value of Freelove's services, the matter to be decided by the jury was simply this, what were Freelove's services reasonably worth? This is the controlling fact issue, and as stated, it was submitted to the Jury (in substance if not in precise form) in Issue 2 of the trial court's charge.

This question is not submitted by the District's requested Issues. The theory of computation evidenced by those Issues requires a determination of what Freelove did not do, and what would have been the reasonable value of the omitted services if Freelove had gone ahead and performed them. If the value of what Freelove actually did is to be determined, then the value of the omitted services must be deducted from what would have been the value of a complete contract job by Freelove if Freelove had done that kind of a job. This method violates the requirement of Rule 279, Texas Rules of Civil Procedure, that the controlling issue be submitted to the jury, and the previous requirements of Rule 277 that submission of issues be direct, and affirmative in form.

■ (2) It can not be determined from the evidence what was the value of the services not performed by Freelove, and therefore no basis existed in the evidence for submission to the jury of the District's theory of computation, represented by the requested Issues.

We note, in this connection, that Freelove has attempted to supplement the record by bringing up a stipulation of certain facts filed in the trial court. The document sent up by the clerk is certified as being a copy of an instrument from the files of an attorney; the certificate recites that the original cannot be found. Under the

circumstances, this instrument can not be treated as a part of the record; but we have read it, and concluded that it is immaterial to a determination of whether the evidence shows the value of the services which the District says Freelove did not perform.

The evidence before us shows that the San Augustine Independent School District entered into a written contract with Charles T. Freelove during October, 1940, wherein Freelove agreed to serve as architect for the erection of a Grammar School Building for the District under a W. P. A. grant, and the District agreed to pay him 5% of "the cost of said work" as a fee. The services to be performed by Freelove were described in general terms; he was to provide plans and specifications, to supervise construction, and to perform other types of services. The cost of the undertaking on which Freelove's fee was based was not stated. Freelove entered upon a performance of his agreement. He prepared an application to the W. P. A. for a grant in aid of the District, and subsequently prepared an amended application which was granted and under which the building was actually erected. Under the arrangement with the W. P. A., the District provided some of the necessary funds and the W. P. A. provided the balance; it is apparent that the weight of the burden lay on the W. P. A. The District also had the benefit of services by the N. Y. A. and of timber from the Forest Reserve. Mr. R. D. Cunningham, who testified on trial, was job superintendent in charge of construction; he was a W. P. A. employee. The District was represented on the ground by an independent agent, Mr. Joe Lacy, the District's Superintendent of Schools. Freelove actually provided plans and specifications, and the building was erected in compliance therewith. The parties evidently relied upon the stipulation referred to above for primary evidence of this fact but there is some evidence in the statement of facts to this effect.

The building was constructed from cast stone, that is, blocks made from concrete and other constituents, and formed in molds on the construction site. These blocks were cast in various sizes, and it is evident that a design was needed to shape and control the mold of the individual blocks, and also, to designate the position the various blocks would have in the building walls. Freelove testified that he furnished the necessary plans, and assisted in training men to cast the stones. He also testified that he helped procure molds, and that he did some work on the molds. Testimony was given in behalf of the District which, viewed as a whole, tends to show that Freelove did provide certain information respecting the design of the individual stones but that it was incomplete or inaccurate in some respect, and that the matter had to be worked out eventually by the W. P. A. Superintendent Cunningham and by workmen on the job. The issue between the witnesses seems to be limited to the designs for the individual stones and the making thereof; the difficulty testified to by Cunningham and other witnesses for the District is with reference to stones not fitting into the plans for the building, and there seems not to have been any trouble with the designs of the building walls.

The only evidence in behalf of the District from which it can be determined how much of the work-not-done is chargeable to Freelove's failure respecting the "rock plans" was given by Cunningham. He testified:

"Q. Could you tell us, Mr. Cunningham, about how much of the entire plans and specifications were your stone plans? A. Well, it was quite an item; it was all the outside, finish work of the outside.

"Q. What per cent of the entire plans and specifications would you say the stone plans were? A. I don't know, I expect around—probably twenty-five or thirty per cent."

The testimony respecting supervision given the job by Freelove shows that he ceased to inspect the work done after March 1st or perhaps March 15, 1942. He testified that at that time "The walls were up, the roof was on, the grading was substantially complete, the partitions were in and I would say the building from a physical standpoint was eighty per cent complete. I think that would be conservative." However, there was testimony that the build

ing had not reached this stage. Cunningham testified:

"Q. In March of 1942, how much of the building was completed at that time? A. Well, I think we had the framework up. You mean the percentage?

"Q. Yes, sir; about what percentage of the building? A. Oh, to be exact, I wouldn't; it has been so long.

"By the court: Just guess at it. What is your best judgment? A. Oh, probably fifty-five or sixty per cent."

Joe Lacy testified, with reference to supervision given the work by Freelove:

"Q. When was the last time you saw Mr. Freelove up here on the job? A. Sometime in March—the first part of March, I think it was.

"Q. Did you see him any time after that? A. No, sir; I did not. * * *

"Q. How many trips would you say Mr. Freelove made down here to see about the supervision of the building up there? A. I don't know. He started off twice a week, then once a week, then once every two weeks, then once a month, then didn't come at all."

This evidence is the basis for any determination of the value of work-not-done by Freelove in the two respects pleaded by the District in its cross action and attempted to be submitted in the requested Issues; and it is deficient in that it does not take into account the fact that the services of an architect under such a contract as Freelove made are not ordinarily of that relatively continuous uniformity in character which might be ascribed to services performed by a mason or other workman. The building was incomplete when Freelove ceased to supervise its erection, but whether 80% as he said, or 55%-60% as Cunningham said, the record fails to show whether the same character of skill and knowledge and the same degree of supervision and attention was required of the architect during the balance of the construction as during the time the architect supervised the project. It might be that of the total time in supervision required on a job the architect would have to devote proportionately more to the first 55%-60% of the construction than to the balance, or that the first 55% or 60% of the work would require much more careful attention from the architect than the balance. It might be that Freelove spaced his visits at wider and wider intervals, as Joe Lacy says he did, because there was less and less necessity that he be present on the construction site. After all, there is nothing in the contract requiring Freelove to devote any specific period of time to supervision. Substantially the same sort of comment must be made regarding the testimony concerning the "rock plans." It may be true, as Cunningham says, that the "rock plans" represented 25% or 30% of the total plans and specifications, and it may even be true, as he did not undertake to say, that said plans represented the same per cent of the manhours required for preparing a complete set of plans and specifications, and yet a lower grade of skill and architectural knowledge might be required of the man preparing these "rock plans" than of the man preparing the remainder of the building plans. This matter would directly affect the cost of said "rock plans."

We think this testimony respecting percentages did not go far enough. There is nothing in the document tendered as a copy of a stipulation of certain facts which will supplement the above evidence in the respects in which said evidence is insufficient.

■ (3) The only other function which any of the requested Issues could serve is to direct the attention of the jury to the specific defaults plead by the District, and in this respect, said Issues were evidentiary, as they perhaps were in any event.

The ultimate question of fact between the parties (all services having been performed on the one building, as a consequence of the one contract) was the question substantially submitted in Issue 2 of the charge, that is, what was the reasonable value of Freelove's services. That question necessarily involved the determination of what Freelove did and thus, the determination of more than one matter of fact, but all matters of fact to be determined fell within the scope of this one final and ultimate question. In this respect, this ultimate issue of fact is analogous to that submitted in Issues

which put to the jury the question of whether a party has complied with a statute of adverse possession. See: Reed v. Magnolia Pet. Co., Tex.Civ.App., 57 S.W.2d 359; Davis v. Dowlen, Tex.Civ.App., 136 S.W.2d 900, 901; White v. Haynes, Tex. Civ.App., 60 S.W.2d 275; Pearson v. Doherty, Tex., 183 S.W.2d 453. It is also analogous to the customary issue submitting the extent of a plaintiff's damages resulting from a personal injury, concerning which see this court's remarks in Galveston H. & S. A. Ry. Co. v. Williams, Tex.Civ. App., 217 S.W. 420, at p. 423, and see Texas & P. Ry. Co. v. Dickey, Tex.Civ. App., 70 S.W.2d 614.

Under Point 5, the District assigns as error the exclusion of evidence that "the president and secretary of the School Board did not have authority to bind the School District to pay the defendant the sum of $5,000, or the amount shown in form 301, and did not ratify such a contract."

As hereinbefore pointed out, Freelove alleged that the District agreed to pay him a flat fee of $5,000 for his services. One of the documents referred to in the testimony as related to the District's application to the W. P. A. for a grant in aid of the construction was Form 301, wherein were listed various items of information, including the sum to be paid the architect as compensation; and in this form the architect's fee was given as $4,999.61. This form was executed by the president and secretary of the District Board of Trustees.

Issue 1 of the court's charge submitted the question of whether the District had agreed to pay Freelove a fee of $4,999.61, and as has been shown, the jury found that the District did not make this contract.

The testimony excluded by the trial court was not pertinent to any other Issue; and Issue 1 having been found in favor of the District against Freelove, the exclusion of the testimony referred to in Point 5, if error, is harmless. We note in this connection that six members of the District's Board of Trustees testified on the trial of this cause, as did the District's Superintendent of Schools, and each of these witnesses denied the fee agreement claimed by

Freelove. The Superintendent of Schools also testified that the amount set up for an architect's fee in Form 301 was an arbitrary sum and further that the statement of this fee in said form did not represent a contract to pay the sum stated in said form.

Point 5 is accordingly overruled.

This disposes of all points of error advanced by the appellant District. The judgment of the trial court is affirmed.